IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

MELANIE JANE KIMBLE,

Plaintiff,

v.                                                    Civil Action No.: 3:15CV71
                                                      (The Honorable Gina M. Groh)

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

Defendant.

## REPORT AND RECOMMENDATION/OPINION

Melanie Jane Kimble ("Plaintiff") brought this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the defendant, Commissioner of the Social Security Administration ("Defendant," and sometimes "the Commissioner"), denying Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment (Dkt. Nos. 9 and 12) and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for DIB on October 4, 2011, alleging disability beginning on February 20, 2010. Plaintiff's application was denied at both the initial and reconsideration levels (R.10). Plaintiff thereafter requested a hearing, which Administrative Law Judge Donna M. Edwards ("ALJ") held on September 4, 2013 (R. 6). Plaintiff, represented by counsel, and Mr. David Humes, an impartial Vocational Expert ("VE"), testified. On December 16, 2013, the

ALJ entered a decision finding Plaintiff was not disabled (R. 7-24). Plaintiff appealed this decision to the Appeals Council and, on April 13, 2015, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-5).

## II. FACTS

### A. Personal History

Plaintiff was born on September 9, 1960, and was fifty-two (52) years old at the time of the administrative hearing (R. 60). She has a GED and can read and write in English (R. 60-61). Plaintiff's prior work experience included working in management and retail (R. 61-62). Her last job entailed working as an office manager for an RV campsite, which ended in April, 2009. Id.

### B. Medical History Summary

*1. Medical History Pre-Dating February 20, 2010*

On March 24, 2009, Plaintiff was seen by Dr. Matthew Gibson for a follow-up on hypertension. She also complained of night sweats, nausea, vomiting, and of joint and muscle aches of the lower extremities (R. 500). During this visit, Plaintiff denied having chest pain, palpitation or shortness of breath, but specifically complained of having pain for the past three months in the "bilateral knees, ankles, and hips, as well as the musculature of the upper and lower legs." Id. Dr. Gibson noted that Plaintiff had no history of arthritis or myalgia. Id. Plaintiff was instructed to take Tylenol for pain and to return in one to two weeks for reevaluation. Id.

Plaintiff returned to Dr. Gibson on April 8, 2009, for revaluation and complaining of continued night sweats and vomiting. Id. Plaintiff also complained of lower quadrant abdominal pain, and reported that her gynecologist felt this was a result of lesions (R. 499). She indicated

that an old prescription for "soma, Percocet, or hydrocodone," did not alleviate the pain. Id. Dr. Gibson instructed Plaintiff to follow-up with her gynecologist the same day and to return in 48 hours for reevaluation. Id.

April 29, 2009, Plaintiff returned to Dr. Gibson for a follow-up visit and complaining of asthma symptoms and continued left lower quadrant abdominal pain (R. 498). Plaintiff stated that her abdominal pain radiated to her lower back, was sharp and was an eight to nine on a scale of one to ten. Id. Plaintiff was directed to take her Albuterol two to three times a day and was placed on prednisone. Id. She was also given a sample of Aciphex. Id.

On January 28, 2010, Plaintiff returned to Dr. Gibson for a follow-up visit and complaining of acid reflux disease, asthma, and a right axillary mass (R 496). Plaintiff noted that she was on Keflex for a cyst that was surgically removed from her neck 10 days prior to this appointment. Id. Dr. Gibson recommended that Plaintiff obtain a sonogram, and noted that her Hypertension was not controlled since Plaintiff had stopped her lisinopril. Id. Plaintiff was directed to restart her medication to treat her Hypertension and acid reflux disease, and was instructed to return for a follow up in six weeks. Id.

On February 1, 2010, an ultrasound of Plaintiff's breasts were taken and revealed a "lobular mass" in her right breast and a "hypoechoic lobular mass" in her left breast (R. 507). A complete imaging evaluation with diagnostic mammography of both breasts were recommended along with further evaluation and biopsy. Id. Subsequently, Plaintiff had a mammogram. On February 3, 2010, her radiology report indicated that an irregular mass was present in Plaintiff's right breast and an oval mass was present in her left breast (R. 505). A biopsy with ultrasound guidance was recommended. Id.

Plaintiff underwent a lumpectomy in February 2010, which was followed by a right-modified [radical] mastectomy in March 2010 (R. 530).

## 2. Medical History Post-Dating February 20, 2010

Plaintiff was seen by Dr. Matthew Page Jones on March 17, 2010, May 24, 2010, June 3, 2010, October 18, 2010, for treatment of breast cancer (R. 335-39). During this period, Plaintiff received chemotherapy treatment. Id. She had a modified radical mastectomy in early March 2010 (R. 335). Plaintiff complained of "persistent bilateral lower quadrant pain, which she attributes to her fibroid uterus (R. 339). Furthermore, her right upper arm appeared swollen during her October visit. Id. Dr. Jones referred her to physical therapy to treat her upper right extremity. Id.

On July 29, 2010, Plaintiff was seen by Dr. John Draper, complaining of pain in her right knee (R. 511). Plaintiff indicated that her knee "gave out" twice, and that she has been experiencing trouble with it since April. Id. She reported that she has been diagnosed with breast cancer since her last visit. Additionally she indicated that her knee "hurts with prolonged walking, prolonged standing, and sitting. Id. Plaintiff's physical exam showed that she "walks with an antalgic gait favoring the right knee." Id. Both a McMurrays test and an apprehension test were negative, and nothing suggests a lumbar radiculopathy. Id. X-rays of the right knee shows some spurring of both the medial and lateral compartments, but a "good joint space" is maintained. Id.

On September 14, 2010, an MRI was taken and revealed Plaintiff's medial meniscus was normal, the lateral meniscus was torn and the anterior horn was extending into the body (R. 512). Dr. Sanjay Saluja noted evaluation of the articular cartilage appeared normal in the medial compartment, but a cartilage defect in the lateral tibial plateau. Id. On October 10, 2010,

Plaintiff had surgery on her right knee, and indicated on November 24, 2010, that it felt different from how it felt prior to surgery, but that she was still having medial and lateral collateral ligament pain (R. 513-15). Dr. Draper noted that Plaintiff was experiencing pain when she tried to flex the knee against resistance and had some numbness below the knee (R 515). Her motion was good and there was no effusion of the knee. Id.

On September 20, 2010, Plaintiff was seen by Diane Doty, a physician assistant, and Dr. Robert Phares (R.659). Plaintiff reported having high cholesterol and high blood pressure and complained of difficulty with breathing on exertion. Id. Lymphedema[1] was present in her right arm (R. 660). Plaintiff's gait and station examination revealed midposition without abnormalities. Id.

On October 20, 2010, Plaintiff returned to Diane Doty, and Dr. Robert W. Phares for a follow-up appointment (R. 657). Plaintiff's gait and station examination showed midposition without abnormalities and coordination was good. Id.

Plaintiff went to the Gynecologic Oncology Center on October 28, 2010, for a gynecologic oncology consultation (R. 280). Plaintiff was seen by Dr. Neil Rosenshein; her chief complaint was "pain in [her] ovary". Id. Plaintiff described her pain as a "constant dull ache such as cramping pain," which was intermittently sharp, and rated it a 3-4 out of 10. Id. Dr. Rosenhein recommended that Plaintiff have a pelvic sonogram as soon as possible. Id.

On December 29, 2010, Plaintiff returned to Dr. Draper who reported that Plaintiff was doing "about the same," but having particular trouble at night (R. 515). He also stated Plaintiff's walking was good and it did not feel like she has a "big effusion in the knees. Plaintiff lost thirty

---

[1] Lymphedema is a type of swelling that is most commonly caused when lymph, fluid containing white blood cells, builds up in the body's soft tissues. National Institute of Health, https://www.nlm.nih.gov/medlineplus/lymphedema.html

pounds since completing chemotherapy. Id. Dr. Draper gave Plaintiff samples of Edlular and Amrix. Id.

On January 24, 2011, Plaintiff returned to Dr. Matthew Jones for a follow-up appointment. Plaintiff reported that she's been bowling and using her left arm (R. 528). Dr. Jones noted that Plaintiff was doing well and that there was no clinical evidence of breast cancer recurrence. Id.

On February 1, 2011, March 22, 2011, March 31, 2011, April 19, 2011, July 12, 2011 and August 24, 2011, Plaintiff was seen by Diane Doty (R. 310-23). At Plaintiff's first visit, Plaintiff's pain rating was 5 out of 10, and Ms. Doty noted that Plaintiff would start PT for lymphedema and a dull ache across her upper back (R. 310). Id. At all six appointments, Plaintiff's gait and station examination revealed midposition without abnormalities, and good coordination (R. 311-24).

On April 27, 2011, Plaintiff went to Mercy Medical Center for breast reconstruction (R. 266). More specifically, Plaintiff underwent a "right deep inferior epigastric perforator free flap breast reconstruction." Id. The procedure went well without complications. Id. Thereafter, Plaintiff complained of chronic pain in her right shoulder blade. Id. Plaintiff returned to the Medical Center for right nipple reconstruction on September 21, 2011 (R. 264). Plaintiff tolerated procedure well (R. 265).

Plaintiff returned to Dr. Matthew Jones for a follow-up visit on July 20, 2011 (R. 530-31). Plaintiff complained of mild discomfort in her upper chest, and experienced some fatigue, but expressed that she was getting around "pretty well" (R. 530). Her laboratory data was normal. However, Dr. Jones noted Plaintiff had a uterine abnormality, but did not believe it was related to her breast cancer (R. 531).

Plaintiff had an MRI of the right knee on August 22, 2011 (R. 303). Results showed the anterior and posterior "cruciate ligaments" and collateral ligaments were intact. Id. Plaintiff's lateral meniscus had an extensive tear, her medial meniscus showed a "small free-edge" tear at the posterior horn. Id. Results also showed significant loss of cartilage. Id.

On October 5, 2011, Plaintiff had a gynecologic oncology consultation with Dr. Neil B Rosenshein (R. 278-79). Results from the examination were "pertinent for heart burn, urinary urgency, frequency, trouble walking and numbness" (R. 278). The Pain Index was four to six out of ten, and the Depression Screen was negative. Id. Her musculoskeletal evaluation revealed limitations in range of motion and mobility. Id. Furthermore, the Clinical Impression was "[uterine fibroids], stable, urinary incontinence both stress and positional" (R. 279). Dr. Rosenshein recommended that plaintiff have a pelvic sonogram in six months. Id.

On October 10, 2011, Plaintiff was seen by Russell DeGroote for a follow-up on her right knee. Plaintiff wished to proceed with arthroscopy of her right knee, which is "meant more for diagnostic purposes to help determine if she is a candidate for a partial knee replacement" (R. 574). Plaintiffs diagnosis was a tear of lateral cartilage or meniscus of knee. Plaintiff had a "partial medial meniscectomy and chondroplasty" on October 18, 2011 (R. 576). Radiological data obtained from PET/CT Scan showed no abnormal activity of the neck, chest abdomen, pelvis or bones (R. 578). Plaintiff's lungs and pleural spacer were clear. Id.

Plaintiff returned to Diane Doty for follow-up appointments on November 16, 2011, and December 15, 2011 (R. 329-34). During the November visit, Plaintiff expressed having urinary incontinence, allergies and pain at a level eight on a scale of one to ten, ten being the worst (R. 329). Plaintiff's gait and station examination revealed midposition without abnormalities and she had good coordination (R. 330). Plaintiff also expressed frustration with learning that Dr.

Groote would not perform another knee surgery until she lost 100 pounds. Id. During the December visit, Plaintiff reported that she was tolerating her medication, Benicar, well (R. 332). Again, she rated her pain at 8, and her gait and station examination revealed midposition without abnormalities and her coordination was good (R. 333).

On December 7, 2011, Plaintiff had another follow-up visit with Dr. Matthew Jones (R. 532-33). Plaintiff was doing well from a breast cancer standpoint, but continued to have issues with urinary incontinence (R. 532). She also expressed having ongoing problems with her right knee. Her laboratory data revealed that she has mild microcytic anemia, and high cholesterol. Id.

On January 17, 2012, Plaintiff was seen by Diane Doty for a follow-up visit and complaining of "a lot of pain in her knees." She stated that she was also experiencing pain in her wrists, hips, elbows, and neck (R. 585). Plaintiff rated her pain an eight on a scale of one to ten, and ten being the worst. Id. Plaintiff's gait was normal and her coordination was good (R. 586). Plaintiff reported that the increased dose of Enablex has not helped, consequently usage was discontinued.

On January 24, 2012, Plaintiff was seen by Dr. William Kao, complaining of urinary incontinence (R. 516). Plaintiff was referred to Dr. Kao by Dian Doty. Plaintiff also complained of lower back pain and informed Dr. Kao of previously having a fibroid tumor in her uterus, tubal ligation and abdominoplasty. Dr. Kao concluded Plaintiff had both stress and urge incontinence, and subsequently discussed both conservative and surgical management of this with Plaintiff (R. 519).

Plaintiff returned to Diane Doty on February 15, 2012, for a follow-up appointment (R. 587). Plaintiff reported continued pain and expressed that it keeps her up at night. Id. Plaintiff also reported that her orthopedist, Dr. Foster, agreed to do a total knee replacement upon medical

clearance and if another orthopedist concurred that she needed the surgery done. Id. Use of Protonix was discontinued and Dexliant samples and prescription were given (R. 588).

On March 7, 2012, Plaintiff returned to Dr. Jones for a follow-up visit (R. 534). Dr. Jones determined that Plaintiff was doing well and showed no clinical evidence of recurrence of cancer. Plaintiff reported that she was going to get a right knee replacement and more plastic surgery in the near future (R. 534). Plaintiff's medications remained the same and included Valium, Volmaren, Maxidone, Benicar, Protonix, Norvasc, VESIcare, and Percocet. Id.

On March 9, 2012, Plaintiff returned to Dr. Kao for follow-up with her urinary symptoms. Plaintiff was treated with antibiotics for Klebsiella urinary tract infection (R. 520). Plaintiff indicated no changes in her symptoms after treatment with bacteria, and urinalysis did not show the presence of red blood cells. Id. Plaintiff has lost weight and indicated possible orthopedic surgery in the future. Id.

Plaintiff returned to Diane Doty on April 25, 2012, for a follow-up appointment (R. 592). Plaintiff complained of pain in her back that was getting increasingly worse and radiating to neck Id. She described her pain level as an eight on a one to ten pain intensity scale. Id.

On May 9, 2012, Plaintiff went to Shenandoah Valley Physical Therapy and Sports Medicine, Inc., complaining of knee and back pain (R. 525). She described her pain level as a nine on a zero to ten pain intensity scale. Id. Plaintiff's diagnosis was back/cervical pain, and recommended treatment included physical therapy three times a week for four weeks, including aquatic therapy, flexibility exercise, strengthening exercises, functional activities, patient education and other modalities.

Plaintiff's radiological report obtained on July 24, 2012, demonstrates Plaintiff has scoliosis of the lower thoracic and lumbar spine and shows evidence for mild multilevel

degenerative disc disease in the mid and lower thoracic spine with mild loss of disc height and small osteophytes (R. 603). It also showed narrowing of the disc height at L1-2 and L2-3 on the right side, as well as L4-5 and L5-S1 (R. 604). No fractures or compression deformities were present. Id.

Plaintiff had another routine visit with Dr. Jones on July 26, 2012, and reported increasing shortness of breath, reflux like symptoms, and chronic back and joint pain (R. 536). Plaintiff's laboratory data was normal except for her cholesterol. Id. Plaintiff also gained weight. Id. Dr. Jones concluded Plaintiff was doing well and showed no evidence of recurrence of cancer (R. 537). He also opined that he believed Plaintiff's shortness of breath was most likely related to her weight and not her heart. Id. Plaintiff's echocardiogram, which was negative confirmed Dr. Jones opinion (R. 538). Plaintiff's medications include Dexilant, Maxidone, Benicar, Norvasc, Celexa Relafen, Endocet, Percoet and VESIcare (R. 614).

An MRI of Plaintiff's thoracic and lumbosacral spine was taken on August 23, 2012, at WVU Healthcare City Hospital (R. 600-01). The MRI revealed mild thoracic scoliosis of the thoracic spine and minimal disc bulge at L4-L5, minimal bilateral neural foraminal stenosis and mild facet disease at L5-S1, and normal disc of the thoracic spine Id.

On October 24, 2012, Plaintiff was seen by Dr. Jones for a routine visit complaining of discomfort in her right arm and right axillary region (R. 538). Dr. Jones noted that Plaintiff's August MRI of her T and L-spine was negative for metastatic disease (R. 538). Plaintiff was referred back to physical therapy to address her right axillary discomfort. Id.

On November 29, 2012, went to the Meritus Gynecologic Oncology Center for a follow-up exam (R. 544). Plaintiff was seen by Dr. Neil Rosenshein. Plaintiff reported no gynecologic issues or concerns on this date. Id. Plaintiff had symptoms of fatigue, shortness of breath,

nocturia, back pain, joint pain and stiffness.  Id.  There was nodularity in Plaintiff's reconstructed right breast and lymphedema to the right arm.  Depression assessment was negative.  Id.  Dr. Rosenshein recommended that Plaintiff complete her scheduled mammogram and have a pelvic ultrasound to assess uterine fibroids (R. 545).  Dr. Rosnshein also instructed Plaintiff to follow up with Physical Therapy regarding the reported increase in the lymphedema in her right arm. Id.

On January 21, 2013, Plaintiff went to WVU Hospital and University Health Associates complaining of back pain (R. 620).  Plaintiff was examined by Jamie Speight, a physician's assistant and Dr. Vincent Miele.  Id.  Plaintiff's obesity and back pain were noted, as well as her "stiff" gait (R. 622).  Plaintiff denied any bowel or bladder incontinence (R. 620).  Plaintiff's recommended treatment included a bariatric evaluation, bone scan, and follow up visit (R. 623).

Plaintiff revisited WVU Hospital and University Health Associates on March 4, 2013. Plaintiff indicated that her back pain increases when walking and standing and that pain has developed in her legs over the past few months (R. 624).  A bone scan showed an "uptake within joints, but no significant spine uptake" (R. 625).  Dr. Miele recommended Plaintiff undergo a blood test to assess her glucose control, noting Plaintiff has poorly controlled hypertenion as well as problems with her hips and right knee."  Id.  Dr. Miel also opined that Plaintiff would find significant improvement in all "disease processes as well as decreased back pain with gastric bypass, and recommended she be evaluated by the pain clinic. Id.

Plaintiff went to Mountain View Family Practice in April 2013, complaining of lower back and knee pain and reporting her worst area of pain to be in her lower back (R. 653-56). She also reported having difficulty moving and walking without having to stop due to fatigue and pain.  Id.  Plaintiff expressed that her weight and chronic pain have been causing /worsening

depression. Dr. Glassford noted Plaintiff's history of morbid obesity and treatment of breast cancer. Id. He also reviewed Plaintiff's MRI and noted mild facet disease at L5/S1 (R. 654). Dr. Glassford recommended that Plaintiff start an exercise program and consult with a dietician to address her obesity (R. 654). He also recommended that Plaintiff continue with Wellbutrin for depression (R. 653-54). Plaintiff continued with Endocet to address back pain. Id.

Plaintiff returned to Diane Doty for a follow-up appointment on May 15, 2013, and July 18, 2013 (R. 664). Plaintiff reported her husband leaving her and being under a great deal of stress. Id. She stated that she was recently seen in the ER for an anxiety attack. Id. Plaintiff also stated that she had a headache for a two-month span. Ms. Doty recommended Plaintiff consider having a psych consultation. Id.

### 3. Medical Reports/Opinions

On January 3, 2012, state agency medical consultant Dr. L. Schaffzin, completed a physical residual functional capacity ("RFC") assessment of Plaintiff (R. 448–55). Dr. Schaffzin found that while Plaintiff possessed no manipulative, visual, or communicative limitations; Plaintiff did possess exertional, postural, and environmental limitations. Regarding Plaintiff's exertional limitations, Dr. Schaffzin found Plaintiff able to:

(1) occasionally lift and/or carry fifty pounds;

(2) frequently lift and/or carry twenty-five pounds;

(3) stand and/or walk for approximately six hours in an eight-hour workday;

(4) sit for approximately six hours in an eight-hour workday; and

(5) push and/or pull with no limitations (R. 449).

Turning to Plaintiff's postural limitations, Dr. Schaffzin noted that Plaintiff can frequently balance, stoop, and climb ramps and stairs; however, Plaintiff can occasionally only kneel,

crouch, crawl and climb ladders, ropes, and scaffolds (R. 450). Finally, concerning Plaintiff's environmental limitations, Dr. Schaffzin stated that Plaintiff must avoid concentrated exposure to: extreme cold, vibration, and hazards such as machinery and heights (R. 452). However, Plaintiff need not avoid exposure to extreme heat, wetness, humidity, noise, fumes, odors, dusts, gases or poor ventilation. Id.

During the physical RFC assessment, Plaintiff alleged that she suffered from "arthritis, lymphedema, hypertension, and feet/knee problems" (R. 455). Dr. Schaffzin found Plaintiff's allegations were supported by medical evidence and believed Plaintiff's statements to be "credible" (R. 453).

On March 30, 2012, state agency medical consultant Dr. Thomas Lauderman, likewise, completed a physical RFC assessment of Plaintiff (R. 482–98). Dr. Lauderman's assessment differed from Dr. Schaffzin's. Dr. Lauderman found that, while Plaintiff possessed no visual or communicative limitations, Plaintiff did possess exertional, postural, manipulative and environmental limitations. Regarding Plaintiff's exertional limitations, Dr. Lauderman found Plaintiff able to:

(1) occasionally lift and/or carry twenty pounds;

(2) frequently lift and/or carry ten pounds;

(3) stand and/or walk for at least two hours in an eight-hour workday;

(4) sit for approximately six hours in an eight-hour workday; and

(5) push and/or pull with no limitations.

(R. 483). Dr. Lauderman specifically noted Plaintiff can ambulate for four hours out of an eight hour day. Id. Regarding Plaintiff's postural limitations, Dr. Lauderman noted that Plaintiff can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs (R. 484). Plaintiff

could not, however, climb ladders, ropes, or scaffolds.  Id.  Turning to Plaintiff's manipulative limitations, Dr. Lauderman found that Plaintiff was limited in reaching in all directions, but had no limitations with handling, fingering or feeling.  Finally, concerning Plaintiff's environmental limitations, Dr. Lauderman stated that Plaintiff must avoid concentrated exposure to: extreme cold, extreme heat, fumes, odors, dusts, gases and poor ventilation, but Plaintiff must avoid all exposure to hazards such as machinery and heights (R. 486).  However, Plaintiff need not avoid exposure to wetness, humidity, noise, or vibration.  Id.  While Plaintiff reported having problems sleeping, bathing and shaving her right side, she also indicated that she cooks, does chores, drives, and shops (R. 489).  Dr. Lauderman found Plaintiff to be credible.  Id.

On March 22, 2012, Dr. Seth Tuwiner completed a disability determination examination of Plaintiff who complained of arthritis, knee pain, numbness in the feet with edema, bladder problems, hypertension and sleeping problems (R. 476).  Dr. Tuwiner concluded Plaintiff has exertional postural, manipulative, and environmental limitations.  Regarding Plaintiff's exertional limitations, Dr. Tuwiner found Plaintiff able to:

(1)  occasionally lift approximately twenty pounds;

(2)  frequently lift and/or carry ten pounds;

(3)  stand and/or walk four hours in an eight hour day;

(4)  sit with no limitation.

(R. 479) Dr. Tuwiner also noted that Plaintiff does not require an assistive device.  Turning to Plaintiff's postural limitations, Dr. Tuwiner noted that Plaintiff can frequently bend, stoop, and crouch.  Id.  Furthermore, Dr. Tuwiner noted Plaintiff has manipulative limitations with pushing and pulling on the right side, and that Plaintiff should avoid elevated heights and uneven surfaces.  Id.

### C. Testimonial Evidence

At the administrative hearing held on September 4, 2013, Plaintiff divulged her relevant personal and work related facts. At the time of the hearing, she was fifty-two (52) years old (R. 60). She obtained a GED, can read and write English, and has never obtained vocational training (R. 60-61). Plaintiff's employment history includes working in management and retail. Id. Plaintiff last worked in April 2009 (R. 62).

Regarding her medical condition, Plaintiff claimed she has constant pain and numbness in her lower extremities, including her knee and groin area; she also stated that she suffers from depression and memory loss (R. 60, 65, 71, 74). When discussing her physical limitations, Plaintiff stated that she gained weight after starting chemotherapy which has made it difficult for her to move, and more specifically, difficult to go up and down stairs (R. 63-65). She expressed that she cannot walk a single city block without having to take a break, she can only stand three to five minutes before needing to sit, and can sit for an hour before needing to stand (R. 69-70). Regarding chores around the house, Plaintiff stated that her mother and daughter "do all the cleaning, cooking, dishes, and laundry (R. 65). Plaintiff indicated that she has difficulty getting out of bed, explaining, that her legs "stiffen up" on her, but that she has no problems bathing or caring for herself (R-66). Furthermore, Plaintiff stated she is able to fold laundry and make her bed (R. 67).

Lifestyle wise, Plaintiff reported she frequently reads on the computer and watches a lot of television, but explained that she gets stiff and has to move after sitting in one position for an hour (R. 67). Furthermore, Plaintiff testified how her health has affected her interactions with her family, explaining that she can no longer go fishing with her daughters and grandchildren because of being unable to walk the distance or sit for extended periods of time; she also stated

that her husband left because they could no longer do some of the activities they used to do together (R. 71). Plaintiff also testified about her incontinence (R. 74).

Plaintiff elaborated on her day-to-day pain, stating that she experiences a constant pain around her knee, which keeps her up at night, and stated her level of pain ranges from a six to nine on a scale of one to ten, ten being the most severe (R. 73-74).

Regarding her medications, Plaintiff informed the ALJ that she takes Welbutrin for her depression, Chloroxicron for arthritis pain, Vesicare for incontinence, Benicar and Amlodipine for blood pressure, Dexilan for acid reflux, Welchol for cholesterol, Oxycodone for pain, and Emberitin for muscle spasms (R. 72). This concluded Plaintiff's testimony.

### D. Vocational Evidence

Mr. David Humes, an impartial vocational expert (hereinafter "VE"), also testified at Plaintiff's administrative hearing (R. 75). The VE characterized Plaintiff's work position as an assistant retail store manager as light with a skill level of 7, and as a lodging facilities manager as medium, with also a skill level of 7 (R. 76).

The ALJ then posed the following hypothetical to the VE:

Q: If the claimant had the ability to lift 20 pounds occasionally; 10 pounds frequently; stand four hours out of an eight-hour workday; walk four hours out of an eight-hour workday; sit six hours out of an eight-hour workday; perform all posturals occasionally except never climbing ropes, ladders, and scaffolds; reaching on the right side overhead only frequently; pushing and pulling on the right only frequently; have the further limitations of avoiding concentrated exposure to extreme cold; avoiding concentrated exposure to vibration; avoiding all exposure to workplace hazards; that is, unprotected heights, moving machinery, and there would be no driving; would the claimant be able to perform her past relevant work?

(R. 77)

After clarification from the ALJ, the VE answered that a person who could stand for four out of eight hours, walk four out of eight hours and sit six out of an eight-hour day would be able to return to work as a retail store manager (R. 77).

Following this question, Plaintiff cross-examined the VE. Specifically, Plaintiff asked the VE if the ALJ's hypothetical was altered to include an individual that was absent three times or more a month, would the individual be able to do the claimant's past relevant work, or any other work in the national economy (R. 78). The VE testified that such an individual would not be able to do any job in the national economy, explaining that one and half days a month is standard for missing time at work. Id.

The Plaintiff then asked, taking the judge's hypothetical as is, whether an individual that is off-task 20% of the time due to bathroom breaks, pain and side effects from medication would be able to perform the past relevant work of the claimant, or any other job in the national economy (R. 79). The VE stated no, explaining that that would be an "unacceptable amount of time off-task," and that the person would not be able to maintain employment. Id.

The Plaintiff further questioned the VE asking whether a person who could stand and walk two hours in an eight-hour workday would be able to perform the past relevant work of Plaintiff (R. 81). The VE answered no, stating that to do a light level of work an individual must be able to stand and work for six hours.

The ALJ followed by inquiring whether there was any work in the national economy for an individual that can stand two hours out of an eight-hour workday, walk two hours out of an eight-hour workday and that possesses the Plaintiff's vocational background (R. 81). The VE responded that certain jobs were available for such a hypothetical person, including a cashier, a

cashier working in the booth at a parking garage, a photocopy machine operator and a mail clerk (R. 82).

Plaintiff's attorney posed a second hypothetical inquiring whether an individual with the occasional postural limitations that can occasionally lift twenty pounds, frequently lift ten pounds, stand and walk two hours in an eight-hour workday, and sit six hours in an eight-hour workday, could perform light work or sedentary work (R. 83). The VE testified the individual could do some light work. Id.

The ALJ followed this exchange by inquiring whether there is any sedentary job that such a hypothetical individual could perform (R. 84). The VE stated that there is including a payroll clerk, repair service clerk, and order clerk (R. 85). Thereafter, Plaintiff's attorney asked whether adding the conditions of being off-task twenty percent, due to bathroom breaks and pain, and being absent three times a month, would eliminate the six jobs the VE identified (R. 85). The VE testified that adding those conditions to the hypothetical would eliminate the jobs. Id. This concluded the VE's testimony.

### E. Report of Contact Forms, Work History Reports & Disability Reports

*1. Work History Report*

On March 26, 2012, Plaintiff completed a work history report (R. 222–26). In the report, Plaintiff indicated that she had worked as a manager for an RV park from 2005 to 2009 (R. 222). Plaintiff described her everyday duties included overseeing maintenance and recreational service employees and inspecting the park, including buildings, fences, trails and roads located inside the park (R. 223). She further stated that the job did not require lifting but included standing and walking for extended periods of time. Id.

Plaintiff also indicated she had worked as an assistant manager from 1998 to 2000 and from 2000 to 2004 (R. 222).  Plaintiff then stated that the heaviest items she had to lift weighed fifty pounds, but that she frequently lifted items weighing ten to fifteen pounds and pushed and pulled up to thirty pounds (R. 224-25).  She added that as an assistant manager she was required to stand and walk for extended periods, frequently reach with her hands, and frequently squat, lift and climb ladders.  Id.

### 2. Disability Reports

On February 22, 2012, Plaintiff completed a disability report (R. 132–42). Plaintiff indicated that certain physical and mental conditions impacted her ability to work: (1) arthritis; (2) knee problems; (3) lymphedema; (4) numbness in feet; (5) severe bladder problems; (6) high blood pressure; and (7) sleeping problems (R. 202).  Plaintiff stated that she stopped working on February 20, 2010, because of these conditions (R. 203).

Plaintiff later submitted two disability report-appeal forms (R. 217-21, 237-41).  Plaintiff reported no change in her condition after her October 5, 2011, Disability Report (R. 217). However, Plaintiff indicated an increased level of knee pain and bladder problems after her February 22, 2012, Disability Report (R. 237).  Plaintiff stated these symptoms approximately occurred on April 1, 2012.  Id.  Plaintiff reported that she needed assistance cooking cleaning, doing laundry and getting in and out of the bathtub and shower (R. 239).  She further indicated that she was unable to walk or stand for any amount of time.  Id.

### 3. Report of Contact Forms

On April 2, 2012, Jade Wheeler completed a report of contact form opining that Plaintiff is capable of performing light exertional work with postural restrictions (R. 216).  Ms. Wheeler

classified Plaintiff's last work as a retail store manager as light exertional work, and concluded that Plaintiff could perform her past work.  Id.

## F. Lifestyle Evidence

### 1. First Adult Function Report

On March 26, 2012, Plaintiff completed an adult function report (R. 227–34). In the report, Plaintiff stated that her mind is not as sharp and that she cannot lift, stand or walk for long periods without having pain or losing her breath (R. 227).  She described her typical day as doing "odds and ends" and going to the doctor at least twice a week (R. 228).  At night, she experiences sleep trouble because she is "unable to get comfortable due to pain." Id.

In the report, Plaintiff explained how she is physically limited in some areas but not in others. Due to her conditions, Plaintiff indicated she is unable to get in and out of the bathtub and as a result can only shower; she is unable to shave under her right arm because she cannot raise it high enough; neither can she do laundry nor clean the bathtub (R. 228).  She can, however, prepare most of her own meals, sort laundry, dust and clean sinks and the stove (R. 229).  She cannot drive for more than an hour without getting leg cramps and experiencing pain (R. 230).  Plaintiff indicated that she has no problems handling money, paying bills, or counting change, but has made several mistakes with her checking account.  Id.

While Plaintiff can perform some activities, others prove more difficult.  For example, Plaintiff can no longer partake in certain hobbies such as bowling fishing, camping, dancing or going to the movies (R. 231).  However, she still is able to go out to dinner, watch television, and sit and talk.  Id.  In addition, Plaintiff indicated she can walk approximately ten to fifteen feet before taking a break, although she can resume walking in 5 minutes (R. 232).

Regarding her mental abilities, Plaintiff has no issues following written instructions or following spoken instructions.  Id.  While she does not handle stress well she handles changes in her routine "ok" (R. 233).

## III. THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . . '[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2004).  The Social Security Administration uses the following five-step sequential evaluation process to determine whether a claimant is disabled:

> (i) At the first step, we consider your work activity, if any.  If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairments(s).  If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

> [Before the fourth step, the [RFC] of the claimant is evaluated "based on all the relevant medical and other evidence in your case record . . . ."]

> (iv) At the fourth step, we consider our assessment of your [RFC] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

> (v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work.  If you can make an adjustment to other work, we will find that you are not

disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2015); 20 C.F.R. § 416.920 (2012).  In steps one through four, the burden is on the claimant to prove that he or she is disabled and that, as a result of the disability, he or she is unable to engage in any gainful employment.  Richardson v. Califano, 574 F.2d 802, 804 (4th Cir. 1978).  Once this is proven, the burden of proof shifts to the Government during step five to demonstrate that jobs exist in the national economy that the claimant is capable of performing.  Hicks v. Gardner, 393 F.2d 299, 301 (4th Cir. 1968).  If the claimant is determined to be disabled or not disabled at any of the five steps, the process will not proceed to the next step.  20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

## IV. THE ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2.  The claimant has not engaged in substantial gainful activity since February 20, 2010, the alleged onset date (20 CFR 416.971 *et seq.*).

3.  The claimant has the following severe impairments: degenerative disc disease of the lumbar spine; asthma; obesity; osteoarthritis (right knee); and status post meniscectomy (right knee).  (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b)except: Can lift/carry 20 pounds occasionally, 10 pounds frequently; sit  6 hours in an 8-hour workday, and stand 4 hours in an 8-hour workday, walk 4 hours in an 8-hour workday; push/pull on right side frequently; reach on right side frequently; perform all postural limitations

(climb ramps/stairs; balance; stoop; kneel; crouch; crawl) occasionally, except can never climb ladders, ropes, scaffolds; avoid concentrated exposure to extreme cold and vibration; avoid all exposure to workplace hazards, such as unprotected heights, moving machinery; no driving.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from February 20, 2010, through the date of this decision (20 CFR §404.1520(f)).

## V. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law. "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1. The new evidence from Diane Doty, PA-C and Dr. Justin P. Glassford, which was previously submitted to the Appeals Council, warrants changing the ALJ's decision (Pl.'s Br. at 7–9).

2. The ALJ's residual functional capacity finding is not supported by substantial evidence (Pl.'s Br. at 10–13).

The Commissioner contends:

1. The additional evidence that Plaintiff submitted to the Appeals Council does not provide a basis for changing the ALJ's decision (Def.'s Br. at 8–13).

2. Substantial evidence supports the ALJ's RFC (Def.'s Br. at 13–15).

## C. New Evidence Submitted Does Not Warrant Remand

Plaintiff contends that the January 29, 2014, letter (hereinafter 2014 letter) (R. 669-70) submitted to the Appeals Council from Diane Doty, a physician assistant, and Dr. Justin P. Glassford, warrants remand of the case (Pl.'s Br. at 9). Plaintiff claims the new evidence satisfies the requirements the court set forth in <u>Borders v. Heckler</u>, 777 F.2d 954 (4th Cir. 1985) and fills an "evidentiary gap," which provides a basis for changing the ALJ's decision (Pl's Br. At 8-9) (Pl.'s Reply Br. at 1-3).

Defendant argues that remand is not necessary because Ms. Doty and Dr. Glassford's opinion does not fill an evidentiary gap, and because the ALJ's decision was supported by substantial evidence (Def.'s Br. at 13). Specifically, Defendant asserts that the ALJ already considered Ms. Doty and Dr. Glassford's previous opinions and that the 2014 letter (R. 669-70) does not fill a gap with respect to the ALJ's view (Def.'s Br. at 11-12).

When a claimant requests review of an ALJ's decision by the Appeals Council, it may submit additional evidence not previously before the ALJ. 20 C.F.R. § 404.970(b). When that

occurs, the Appeals Council should first determine whether the submission constitutes "new and material" evidence that "relates to the period on or before the date of the [ALJ's] hearing decision." Id. If the submission constitutes new and material evidence, the Appeals Council should evaluate the entire record including the new and material evidence. 20 C.F.R. § 404.970(b). The Appeals Council will review the case if it finds that the ALJ's "action, findings, or conclusion is contrary to the weight of the evidence currently in the record." Id. If however, the Appeals Council finds that the ALJ's "action, findings or conclusion is not contrary to the weight of the evidence currently in the record, it can deny the request for review. Meyer v. Astrue, 662 F. 3d 700, 705 (4th Cir. 2011). It is the role of this court to review the record as a whole, including the new evidence, to determine whether substantial evidence supports the Commissioner's findings. Meyer at 704.

Here, while the Appeals Council specifically incorporated the 2014 letter into the record, it did not specifically determine whether it considered the letter to be "new" and "material." Evidence is new if it is "not duplicative or cumulative," and material, "if there is a reasonable possibility that the new evidence would have changed the outcome." Wilkins v. Sec'y, Dep't of Health & Human Servs., 953 F.2d 93, 96 (4th Cir. 1991).

After careful review of the record the court finds that the 2014 letter is not new or material. Much of the letter merely restates what is in Ms. Doty and Dr. Glassford's August 29, 2013, letter (hereinafter "2013 letter") (R. 668); understandably so, as it was written after the ALJ concluded that the first letter had minimal value because Ms. Doty failed to elaborate on "the degree of severity she perceived of claimant's lymphedema; what functional limitations she believed were presented; and/or a description of the measures (i.e., conservative, surgical medications, etc.) that have been explored/exhausted." While there is restated information and

25

information new to the 2013 letter, there is nothing presented in the 2014 letter that is factually new to the record as a whole.  Compare R. 668 (Ms. Doty's 2013 letter) with R. 669-70 (Ms. Doty's 2014 letter).  The information new to the 2013 letter (R.668), but not new to the record as a whole, is consistent with treatment records presented to the ALJ.  Note the following comparisons:

1. Compare R.669 (2014 letter noting Plaintiff is under Ms. Doty's care for "lymphedema, secondary to breast cancer; osteoarthritis; asthma; gastroesophageal reflux disease; hypertension; and hyperlipidemia"); with R. 585-99 (treatment records from Ms. Doty identifying the same diagnoses).

2. Compare R. 669 (2014 letter noting Plaintiff has been refused knee replacement surgery due to her weight); with R. 330 (treatment records from Ms. Doty noting Plaintiff's frustration when informed her surgeon would not do "other surgeries until she has lost 100 pounds").

3. Compare R. 669 (2014 letter stating Plaintiff "tried physical therapy with no relief in pain"); with R. 596 (treatment records from Ms. Doty indicating "[Plaintiff] has been to PT with limited improvement").

4. Compare R. 670 (2014 letter stating "[d]iagnostic testing shows [Plaintiff] has lumbar facet disease with lumbar disc bulging); with R. 601, (treatment records from Ms. Doty noting Plaintiff's lumbar disc bulges and facet disease).

5. Compare R. at 670 (2014 letter noting Plaintiff's back and bilateral hip pain is also greatly aggravated by the limping and gait adjustments from the osteoarthritis); with R. 17, 18 (ALJ's discussion of Plaintiff's back and osteoarthritis and Plaintiff's gait, station, muscle strength and tone being reported as "normal").

Furthermore, the record is replete with treatment records identifying Plaintiff's medications, changes in medications, and Plaintiff's continued experience of pain. Because the 2014 letter is not new or material, remand is not appropriate.

Moreover, even if the court were to find a portion of the 2014 letter to be new and material, which it does not, the letter does not fill an "evidentiary gap" and such a finding does not disturb the conclusion that the ALJ's decision is supported by substantial evidence. See Smith v. Charter, 99 F.3d 635 (4th Cir. 1996) (concluding substantial evidence supported the ALJ's findings.)

In Meyer, the Fourth Circuit remanded the case after suggesting an "evidentiary gap" played a role in the ALJ's decision. Meyer, 662 F.3d at 707. The court pointed out that the ALJ did not have opinions from claimant's treating physicians. Consequently, in seeking review with the Appeals Council, the claimant submitted an opinion from a treating physician. The court noted the "evidentiary gap" required remand for the ALJ to assess.

This case is distinguishable from Meyer. As previously mentioned, the 2014 letter repeats evidence already before the ALJ, and the ALJ's decision reveals she considered the various observations contained in the letter and in Plaintiff's medical records. In short, the 2014 letter does not fill an evidentiary gap and is not missing evidence as was the treating physician's letter in Meyer. Therefore, the court finds that the 2014 letter does not warrant remand.

**D. The ALJ's Residual Functional Capacity Finding is Supported by Substantial Evidence**

Next, Plaintiff argues that the ALJ failed to properly assess her RFC because the ALJ did not "properly address conflicting evidence related to Plaintiff's RFC" (Pl's Br. at 11). More specifically, Plaintiff argues that the ALJ did not properly consider Dr. Tuwiner's clinical observations in making her RFC finding; her primary contention is that the ALJ gave greater

weight to the opinion of Dr. Lauderman, a non-examining State agency consultant, over that of Dr. Tuwiner, an examining State agency consultant. (Pl's Br. 12-13).

Defendant counters this stating the ALJ's RFC determination fully complied with the law (Def's Br. at 15). Defendant argues that the ALJ "thoroughly discussed all of the relevant evidence, including Plaintiff's allegations regarding her symptoms and limitations, her treatment history, the clinical findings, and the opinion evidence. (Dl's Br. at 15). Defendant also asserts that the ALJ discussed Plaintiff's medical evidence and addressed her functional abilities in terms of "work-related physical functioning." Id. at 15.

Regarding weight given to medical opinions, generally, the opinions of examining sources are given greater weight than the opinions of non-examining sources, and treating sources are given greater weight than non-treating sources. 20 C.F.R. § 404.1527(c). However, "an ALJ may assign little or no weight to a medical opinion, even one from a treating source . . . if he sufficiently explains his rationale and if the record supports his findings." Wireman v. Barnhart, 2006 WL 2565245, at *8 (W.D. Va. Sept. 5, 2006).

After careful review of the record, the court finds that the ALJ did not err in her decision to assign less weight to the opinion of Dr. Seth Tuwiner, an examining source, than that of Dr. Lauderman, a non-examining source. The court finds that the ALJ provided a sufficiently explained rationale when assigning less weight to Dr. Tuwiner's medical opinion. Specifically, the ALJ stated it is "not clear that the consultative examiner Dr. Tuwiner, unlike Dr. Lauderman, was aware of and/or fully evaluated the impact of claimant's asthma on her ability to perform basic work activities" (R. 21). Additionally, the ALJ acknowledged that while Dr. Tuwiner noted Plaintiff showed postural limitations when bending, stooping, and/or crouching, her primary care practitioners noted that Plaintiff's gait and station were consistently found to be free

of abnormalities, her coordination was described as 'good,' and she was described as being in 'no apparent distress' (R. 17). The ALJ's decision to assign more weight to the medical opinion evidence most consistent with the record as a whole is permissible and appropriate.

Additionally, the ALJ's RFC findings are supported by substantial evidence. When assessing a claimant's RFC, the Social Security Ruling 96-8p, 61 Fed.Reg. 34,475 requires an ALJ to "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015). Those functions "include physical abilities such as sitting, standing, walking, lifting, carrying, pushing, and pulling; mental abilities . . . and other abilities such as seeing, hearing, and the ability to tolerate environmental factors." Cichocki v. Astrue, 729 F.3d 172,176 (2d Cir. 2013) (citing 20 C.F.R. §§404.1545, 416.945). Only after the function-by-function analysis has been completed that RFC "may be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." Mascio, 780 F.3d at 636 (quoting SSR 96-8p, 61 Fed.Reg. at 34,475). The RFC "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." Mascio, 780 F.3d at 636 (citation omitted). A discussion of the functional limitations in broad terms followed by an in-depth analysis supporting the ALJ's function findings will satisfy the regulations requirement as well. See Ashby v. Colvin, 2015 WL 1481625, at *2 (S.D.W. Va. Mar. 31, 2015)

In this case, the ALJ found that Plaintiff has the RFC to perform light work of a limited range that included exertional, postural, and environmental limitation (R. 15). While Plaintiff alleged that her knee and back pain left her unable to sit for more than one hour, walk more than

one block (without a break) or stand for longer than five minutes, the ALJ found that Plaintiff's medically determinable impairments "cannot reasonably be expected to produce the symptoms to the degree alleged by the claimant." (R. 12, 16, 17). In other words, the ALJ's decision demonstrates that the ALJ believed Plaintiff was experiencing back and knee pain, as a result of one or more medically determinable impairments, but did not credit Plaintiff's assertion that she was only able to sit for more than one hour, walk more than one block (without a break) or stand for longer than five minutes.

The ALJ provided a substantive discussion of her rationale. First, the ALJ observed that Plaintiff's lower back pain was confirmed by treating and consultative practitioners, but also noted that while Plaintiff's orthopedic surgeon acknowledged Plaintiff's discomfort, he noted there was "nothing to suggest lumbar radiculopathy" (R. 17). Second, the ALJ observed that while a consultative medical examination performed in March of 2012, revealed that Plaintiff had postural limitations, her primary care practitioners, found Plaintiff's "gait and station were consistently found to be free of abnormalities, [her] coordination was 'good,' and was described as being in 'no apparent distress'" Id. at 17. Third, medical records from Shenandoah Valley Physical Therapy and Sports Medicine notes from May 2012, revealed Plaintiff's "back extensor and lower extremity strength as a 4/5, with an ultimate therapeutic goal of 5/5. Id. at 18. Fourth, the ALJ found Plaintiff's reports of pain during movement to be "incongruent with the bowling activity she reported, which . . . requires frequent bending, bimanual dexterity, and steady bimanual support of solid weight." Id. at 18. Fifth, medical records confirmed Plaintiff's osteoarthritis of the right knee in April of 2011, which was followed by a partial medial meniscectomy on October of 2011, and subsequent radiological imaging in March 2013, which revealed, mild radiotracer accumulation consistent with degenerative disease, but on clinical

examination two days later, Plaintiff's gait, station muscle strength and tone in her upper and lower extremities were reported as "normal." Id. at 18. Sixth, medical records showed that in May 2010, Plaintiff experienced an asthma exacerbation, which required hospitalization, but since that time Plaintiff's asthma has been "very well controlled." Id. at 19. Seventh, ALJ noted that while Plaintiff "struggles with obesity, . . . the medical evidence shows that claimant has experienced progressive success in addressing this impairment. Id. at 19.

Taking a comprehensive view of the record, the ALJ concluded that the record did not support Plaintiff's symptoms to the extent of Plaintiff's allegations. It is apparent that the ALJ found that Plaintiff experiences back and knee pain. In particular, the ALJ assigned "some weight" to State agency opinions that found Plaintiff could lift and/or carry fifty pounds; could frequently lift and/or carry twenty-five pounds; could sit, stand , and/or walk for 6 hours in an 8-hour work day; unlimited pushing/pulling; could frequently climb ramps/stairs, balance, and stoop; could occasionally climb ladders, ropes, and scaffolds; and could kneel, crouch, and crawl; explaining that the opinions do not comport with the evidence of the record. Id. at 20.

In light of the extensive review of the medical evidence in the record, the court finds that the ALJ properly based her RFC finding on Plaintiff's complaints, objective medical evidence, and the opinions of treating, examining, and non-examining physicians. Moreover, the ALJ weighed conflicting evidence and adequately explained the basis for her resolutions of conflicts in the evidence. Thus the court concludes that the ALJ assessed Plaintiff's physical RFC in accordance with regulations and remand is not appropriate.

## VI. RECOMMENDED DECISION

For the reasons herein stated, I **accordingly recommend** Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and struck from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), <u>cert.</u> denied, 467 U.S. 1208 (1984); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

The Clerk of the Court is directed to provide an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 27th day of May, 2016.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE